Filed 8/25/23  P. v. Diaz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTONIO DIAZ,<br><br>    Defendant and Appellant. | F084834<br><br>(Super. Ct. No. SF019775B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Cameron M. Goodman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

After his girlfriend asked him to move out of their residence, defendant Antonio Diaz returned to the residence, confronted his girlfriend, and, when she would not reconcile with him, called for his brothers who then stabbed her repeatedly. A jury convicted defendant of attempted premeditated murder, conspiracy to commit murder, and other charges. The trial court sentenced defendant to a total term of imprisonment of 25 years to life, plus four years. Defendant raises a single issue for our review: Whether the trial court's failure to read a standard reasonable doubt instruction as part of its predeliberation instructions to the jury (having read such an instruction during jury selection and providing the written instruction to the jury during deliberations) violated his federal and state rights to due process. The People respond that the jury instructions as a whole advised the jury that the prosecution had the burden to prove its case beyond a reasonable doubt and, in any event, any such error was harmless. We affirm the conviction.

## PROCEDURAL BACKGROUND

The District Attorney of Kern County filed an amended information on May 20, 2021, charging defendant with attempted premeditated murder (Pen. Code, §§ 664, 187, subd. (a), 189;[1] count 1), conspiracy to commit murder (§§ 182, subd. (a)(1), 187; count 2), assault with a deadly weapon (§ 245, subd. (a)(1); count 3), burglary of a residence (§ 460, subd. (a); count 4), false imprisonment (§ 236; count 5), threaten with intent to terrorize (§ 422; count 6), and child abuse likely to produce great bodily injury (§ 273a, subd. (a); count 7). As to count 4, the amended information included an allegation that a nonaccomplice was present during the burglary (§ 667.5, subd. (c)(21)).

A jury convicted defendant of all charges (except for count 6 for which it failed to reach a verdict) and found true the nonaccomplice burglary allegation. The trial court

---

[1] Undesignated statutory references are to the Penal Code.

2.

sentenced defendant on June 18, 2021, to a term of 25 years to life for conspiracy to commit murder (count 2); a stayed term of seven years to life for attempted murder (count 1); stayed middle terms of three years, four years, and two years for assault with a deadly weapon (count 3) burglary of a residence (count 4), and false imprisonment (count 5), respectively; and a consecutive middle term of four years for child abuse likely to produce great bodily injury (count 7).

The court also ordered defendant to pay victim restitution (former § 1202.4, subd. (f)), a $300 restitution fine (former § 1202.4, subd. (b)), and a suspended $300 parole revocation restitution fine (§ 1202.45) as to count 2; and $30 criminal conviction (Gov. Code, § 70373) and $40 court operations (§ 1465.8, subd. (a)) assessments as to counts 1 through 5 and 7.  The trial court dismissed count 6 on the prosecutor's motion.

Defendant timely appealed on August 22, 2022.[2]

## FACTS

Defendant had been involved in a sexual relationship with Wendy M. and lived with both Wendy and her daughter, E.G.,[3] for approximately three years.  On October 20, 2019, Wendy decided to break up with defendant and asked that he move out of her residence, a converted garage located behind a main residence in Wasco.  Wendy decided to terminate her relationship with defendant after E.G. played Wendy a recording of defendant professing his love to another woman.  Unable to reach defendant, Wendy contacted defendant's brother, Juan Manual, and instructed him to tell defendant to pick up his belongings because she no longer wanted defendant in her life.  Wendy said the same thing to defendant when he called her and accused her of being jealous.

---

[2]     We granted defendant leave to file a late appeal on August 18, 2022.

[3]     E.G. was born in 2009 and was 11 years old at the time of the trial.

Thereafter, Wendy arrived home with E.G. and saw that defendant was at the residence with his brothers Mariano Diaz and Lorenzo.[4] Defendant removed his property from the residence. Before leaving, defendant told Wendy that Mariano wanted to kill her but did not because there were too many people who would see it. She told defendant that she would not get back together with him and that she intended to move out of town. Defendant left after Wendy advised him that she would be going to work later.

Wendy and E.G. returned home from Wendy's place of employment at approximately 10:30 p.m. She parked at the back of the residence just off the alley after opening the gate, which she had padlocked to prevent defendant from returning. Wendy observed that someone had unsuccessfully attempted to open the gate and was nervous when she and E.G. entered the residence through the back door. The residence was a garage converted to a small studio with the kitchen and dining area near the back door and separated by a curtain from the sleeping area and bathroom, which were near the front door. As Wendy and E.G. entered the bedroom area, defendant jumped out of the bathroom and said, "You didn't want to see me?" Wendy had not given defendant permission to be in the residence, was frightened, and started to shake.[5] She feared for her safety and the safety of her daughter.

---

[4] Although Wendy testified that Lorenzo and defendant were brothers, defendant testified that Lorenzo was only a friend. Lorenzo's last name does not appear in the appellate record.

[5] Kern County Sheriff's Deputy David Manriquez testified that he prepared a report documenting that Wendy heard defendant knocking on the front door and allowed him into her residence. Wendy denied that she made that statement. Manriquez recorded his conversation with Wendy while she was being treated by emergency personnel outside her home, Kern County Sheriff's Deputy Luis Almanza's conversation with Wendy while she was in the ambulance, and Manriquez's second interview of Wendy while she was being treated at a hospital. Wendy did not mention the manner in which her assailants entered the residence in her first interview, and, during the second interview, told Deputy Almanza that defendant was inside the residence. When questioned at the hospital, Wendy told Manriquez that defendant frightened her when he emerged from the bathroom into the bedroom upon her return home from work.

4.

Defendant asked Wendy to get back together with him, but she refused and yelled for E.G. to get off the bed and leave the residence. After E.G. left, defendant asked Wendy if she was sure about not reconciling and then pushed her onto the corner of the bed when she reiterated that she would not reconcile. Defendant then said, "Action. Kill her."

Wendy heard the front door bang, and Mariano and Juan entered and attacked her. Both men were on top of Wendy as she tried to defend herself. Mariano had something shiny that he used to cut her left cheek, jawline, and the left side of her neck and throat. Juan repeatedly struck her stomach and torso in a stabbing motion with an object in his hand. Wendy heard a sound like "blop, blop, blop," realized her neck was bleeding, and believed that they had cut her jugular. Defendant ran in from the kitchen and said, "Let's go, the police [are] coming." As they ran out, Wendy asked defendant for help, but he did not stop.

Wendy sustained cuts to her face, lip, chin, left forearm, and neck from Mariano and seven or eight wounds to her stomach and torso from Juan. Wendy ran to the front of the main residence where her neighbors then assisted her to try to stop the bleeding from her neck. One of the neighbors called 911 and reported that defendant had stabbed Wendy and she was bleeding. Wendy told the 911 operator, "He stabbed me with a knife," and, "They attacked me in my house." Wendy was transported by ambulance to a helicopter and then to the hospital where she received many stitches that left scars. She testified that she still feels pain in her lips and wakes up screaming from fear that her assailants will return.

Wendy testified that she defended herself but did not have a weapon, threaten her assailants, or try to injure them before the attack. Wendy did not physically engage with defendant during their earlier argument either.

A few days after the incident, Wendy realized that defendant had left her two voicemails. In the first message, defendant attempted to apologize and said, "I should've

5.

not done that to you, forgive me." He asked Wendy to contact his sister and promised Wendy a place to live and that she would not have to work anymore. Defendant promised, that if Wendy wanted him in jail, he would turn himself in to the police but begged her to contact his sister and told her that his family would give Wendy everything she needed. Defendant also said, "I know that my brother, [Mariano], won't get out anymore, I don't know how many years he'll get but okay, that's my fault. How do you think I feel? My brother is in jail because of me and you're suffering in a hospital .…" Defendant claimed that he loved Wendy and "did it because of love, because they told me that you were with somebody else, that's why I tried killing you but I reacted."

During his second message, defendant said, "I know that I should've not done that to you," "[b]ut please contact my sister. I'll turn myself in if that's what you want, I know I should've not done that to you and forgive me.… But they told me a bunch of things, that's why I was so angry." Defendant promised to turn himself in to the police but "want[ed] to fix a few things" with Wendy and offered her a "huge amount of money, please." He said, "I know that we're not buying you or anything like that, I know that I'd never buy what I did to you but so that you don't work, I'll offer you some money, I'll see how I can do that."

Wendy testified that in August 2017, defendant got on top of her while she was lying down and tried to strangle her. Defendant said that he would kill Wendy because he was jealous and did not trust her. After the attack, Wendy had marks on her neck and could not move it. E.G. called 911. Kern County Sheriff's Deputy Matt Constamagna testified that he responded to the incident and that Wendy described that defendant choking her and then punching her in the face when she told defendant to leave. Constamagna observed swelling and redness in the areas where Wendy been punched and choked.

E.G. testified she played Wendy a recording of defendant having a conversation with another woman and later saw defendant remove his belongings from their residence.

6.

When she and Wendy returned home that evening, defendant was there and said, "Surprise, mommy." She was scared but left when Wendy told her to leave. E.G. saw defendant push Wendy toward the bed and heard them fighting. E.G. went outside and heard defendant say, "Action." E.G. lost consciousness when defendant grabbed her by the hair and threw her to the ground. When she woke, E.G. yelled for help and looked for her mother in the front yard with the neighbors. E.G. did not see anyone other than defendant in the residence during the incident.

Defendant testified that he returned to the residence around noon that day. He called Wendy, who as not home at the time. She yelled and insulted him and then sent him a recording of his conversation with another woman. Defendant then received a call from one of his brothers who conveyed a message from Wendy that he should move out. Defendant called his brother, Mariano, to assist him. When Wendy returned home, defendant went over to her car and begged Wendy to forgive him. She refused, and then Mariano and Lorenzo arrived and drove defendant to Juan's house.

According to defendant's testimony, later that day, Wendy called defendant and asked him to return to the residence to pick up his medicine and a ring. During the call, Wendy threatened to kill defendant and the woman with whom Wendy believed defendant was having an affair.

Defendant walked to Wendy's residence, knocked on the door, and entered when Wendy let him inside. He texted Juan to come to the residence because he needed a car to carry additional belongings. Defendant admitted that he was upset that Wendy ended their relationship and was humiliated that she had broken up with him in front of the neighbors earlier that day. However, defendant denied that he went to Wendy's that evening to discuss their relationship and only did so at Wendy's request to pick up his belongings.

Defendant testified that he was in the kitchen while Wendy was speaking with Mariano and Juan in the bedroom. He heard Wendy call out and saw Juan and Mariano

7.

on top of Wendy on the bed. Defendant denied that he saw them attacking Wendy and testified that when he entered the room, his brothers immediately ran out and he followed them to find out what had happened. Although defendant testified that he intended to defend Wendy, he left the residence without calling for help or helping Wendy. Mariano later told defendant that Wendy had nail cutters and intended to hurt defendant and that Mariano was defending defendant. However, defendant testified that he did not see Wendy with a weapon and Wendy never did anything physical to either himself or his brothers. Defendant said he did not hurt Wendy and did not ask his brothers to do so.

Defendant testified that he did leave messages for Wendy in which he admitted that he was at fault for trying to kill her but claimed that he only did so because his father instructed him to do so and to protect his brothers.

## DISCUSSION

**I.  The trial court erred in failing to define reasonable doubt during final instructions to the jury, but the error was harmless.**

### A.  Background

#### 1.  *Jury selection.*

At the commencement of jury selection, the trial court reviewed hardship requests for four groups of prospective jurors on May 4 and 5, 2021. The trial court directed those prospective jurors that had not been excused to return on May 6 and 10, 2021.

On May 6, 2021, the trial court addressed the first group of prospective jurors and instructed them as follows: "The burden of proof in this criminal case, just like all criminal cases, is beyond a reasonable doubt. The only side that has the burden of proof is the prosecutor …. [¶] So [the prosecutor], in order to get a guilty verdict received from you, must prove each charge beyond a reasonable doubt. The defendants and the defense attorneys don't have to prove anything. Each defendant is presumed to be innocent."

The trial court read and explained CALCRIM No. 103 as follows: "I'm actually going to read to all of you one jury instruction. You'll hear many of these later on in the trial, but this instruction is the instruction on the burden of proof. And it's important that I read that to you now. [¶] I will now explain the presumption of innocence and the People's burden of proof.… [¶] … [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. [¶] Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.… [¶] … [¶] So it's proof beyond a reasonable doubt, which is proof that leaves you with an abiding, long-lasting conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. That's the definition of the burden of proof. [¶] It's not anything different than that. It's not beyond a shadow of a doubt. It's not preponderance of the evidence. It's not, well, I think they're guilty. It's not I think they're not guilty. It's exactly what I read to you. Don't worry. You don't have to have it memorized. [¶] Everyone will have their own set of jury instructions in the jury room, and you can always ask questions. So that's the burden of proof."

During questioning of the first group of prospective jurors, defense counsel reiterated that the prosecutor had to prove every element of each crime beyond a reasonable doubt and received assurances from the prospective jurors that they would hold their ground if they did not believe that the evidence rose to the level of beyond a reasonable doubt. The prosecutor also discussed his burden of proving the charges beyond a reasonable and requested assurances from the prospective jurors to abide by that standard.

After the parties exercised some of their challenges, the first group of prospective jurors were joined by a second group of prospective jurors later that afternoon. The trial court then instructed both groups of prospective jurors: "In this criminal case, in every criminal case, there's a burden of proof. That proof is beyond a reasonable doubt. There's only one side that has that burden. That is the prosecutor." The trial court continued: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People to prove a defendant guilty beyond a reasonable doubt. [¶] Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.… [¶] Unless the evidence proves a defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty. So it's proof beyond a reasonable doubt, which is proof that leaves you with an abiding, long-lasting conviction that the charge is true. [¶] The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. That's the burden of proof. It's not beyond all shadow of a doubt. It's not preponderance of evidence, or I think they're guilty. That's the burden."

The trial court also explained that each juror should listen to the evidence and decide if the charges were proven beyond a reasonable doubt. To do so, the trial court would give the jury the law and each juror would have a set of the jury instructions during deliberations. The trial court explained, "So you take the law. You compare it to the evidence or the facts, and then you see are the charges proven beyond a reasonable doubt .…" "Your job is not to decide if a defendant is a nice person or a bad person, or not a nice person. It's are they proven to have committed the crime beyond a reasonable doubt or not."

Jury selection resumed on May 10, 2021. During questioning, defense counsel discussed the reasonable doubt standard and the trial court defined reasonable doubt to the prospective jurors as requiring an abiding or long-lasting conviction. Defense counsel advised the prospective jurors that reasonable doubt is the highest burden of proof in the justice system and discussed its meaning with the jury a second time. Defense counsel mentioned the burden of proof more than seven times during questioning. The prosecutor also discussed his burden to prove the charges beyond a reasonable doubt.

After the parties exercised their challenges, the trial court swore in the prospective jurors and alternates. The trial court advised the alternates that they had the same responsibilities and obligations as the other 12 jurors and that all the instructions provided applied to them as well.

## 2. *Jury instructions prior to close of evidence.*

When trial resumed on May 12, 2021, the trial court instructed the jury before opening statements. The trial court explained the purpose of opening statements and that they would be followed by the prosecution's presentation of the evidence (CALCRIM No. 100 [Trial Process]). In discussing the possibility that the defense might also present evidence, the trial court instructed that the defense was not required to present any evidence "[b]ecause each defendant is presumed innocent, each defendant does not have to prove they're not guilty." The trial court advised the jury, "I have already explained to you the burden of proof and read that to you."

The prosecutor concluded his opening statement by expressing confidence that at the end of the trial, the jury would find defendants guilty of the charges beyond a reasonable doubt. Mariano's defense counsel advised the jury that the evidence would not be sufficient to convince the jury beyond a reasonable doubt that Mariano was even involved in the offenses. Defendant's counsel told the jury that the prosecution had to

11.

prove beyond a reasonable doubt that defendant's specific intent was premeditated in order to convict him of conspiracy to commit murder. Counsel asked the jury to conclude that the circumstantial evidence of defendant's intent was not sufficient to convict him of premeditated murder.

Prior to the presentation of defendant's prior act of domestic violence on May 13, 2021, the trial court explained that the evidence was "for a limited purpose" and stated, "I'm not going to read that instruction to you right now because it's quite lengthy, and I haven't talked to the attorneys about it yet. But it is an important instruction that limits [the evidence] in a certain way and does have a different burden of proof than beyond a reasonable doubt as to whether that prior incident occurred or not. [¶] That does not change the burden of proof that the district attorney must prove each charge beyond a reasonable doubt."

### 3. *Predeliberation jury instructions.*

The parties and trial court conducted an instruction conference in chambers, which the trial court later memorialized on the record. The trial court noted that it had read several instructions, including CALCRIM No. 103, regarding reasonable doubt. The court then recited the instructions that it intended to read as result of its conferring with counsel and did not include CALCRIM No. 220, also regarding reasonable doubt. The parties indicated their agreement. The trial court e-mailed a copy of the jury instructions to all counsel and ascertained that the parties had no objections.

The trial court instructed the jury prior to closing arguments on the morning of May 19, 2021. The court informed the jury that each juror would have their own set of instructions in the jury room.[6] The trial court prefaced its final instructions with, "I will

---

[6]     Defendant suggests that the written instructions may not have been provided to the jury. However, on May 20, 2021, the foreperson sent a written note to the court and requested a transcription of the prosecutor's remarks concerning "[CALCRIM No. ]1300. Criminal Threat," and also asked whether the jurors "have to find that all of the points 1–6 are true?  Page 66." Page 67 of the written jury instructions contains CALCRIM No. 1300, which sets forth six

12.

now instruct you on the rest of the law that may apply to this case." The trial court did not reinstruct the jury on reasonable doubt pursuant to CALCRIM No. 220. However, CALCRIM No. 103 was included in the packet of written instructions provided to the jurors, and the trial court advised that each juror would have a set of the instructions in the jury room. In addition, several of the court's instructions did reference the reasonable doubt standard in the context of explaining general principles.

When instructing regarding circumstantial evidence and the sufficiency of evidence (CALCRIM No. 224), the trial court stated, "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt." In explaining eyewitness testimony (CALCRIM No. 315), the trial court instructed the jury that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

In explaining to the jury a defendant's right not to testify (CALCRIM No. 355), the trial court instructed that a defendant can "rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt." Additionally, while explaining the corpus delicti rule (CALCRIM No. 359), the trial court indicated, "You may not convict a defendant unless the People have proved a defendant's guilt beyond a reasonable doubt." In instructing the jury as to defendant's failure to explain or deny adverse testimony (CALCRIM No. 361), the trial court stated, "You may not convict a defendant unless the People have proved a defendant's guilt beyond a reasonable doubt.… [¶] Any such failure [to explain evidence] is not enough

_____

elements for the crime "criminal threat," confirming that the jury had a written set of instructions.

13.

by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt." Addressing the use of coconspirator's statements (CALCRIM No. 418), the trial court explained that the jury could not rely upon a coconspirator's statement unless the People proved certain facts by a preponderance of the evidence and that it is "a different standard of proof than proof beyond a reasonable doubt."

The trial court also instructed the jury on the substantive elements of each of the charged offenses, and those instructions informed the jury the prosecutor carried the burden to prove the elements of the offenses.[7] Specifically regarding the conspiracy charge, the trial court instructed that all jurors must agree that "it is proven beyond a reasonable doubt that a defendant conspired to commit first degree murder." Additionally, the trial court explained to the jury that the People had (1) "the burden of proving beyond a reasonable doubt that [defendant] did not withdraw from the conspiracy" (CALCRIM No. 420), (2) "the burden of proving beyond a reasonable doubt that the attempted killing was not justified" (CALCRIM No. 505), (3) "the burden of proving beyond a reasonable doubt that the killing—and you understand the conspiracy to kill—was first degree murder rather than a lesser crime" (CALCRIM No. 521), (4) "the burden of proving [the first degree murder allegation] beyond a reasonable doubt" (CALCRIM No. 601), (5) "the burden of proving beyond a reasonable doubt that the defendant attempted to kill someone and was not acting as a result of a sudden quarrel or in the heat of passion" (CALCRIM No. 603), (6) "the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense" (CALCRIM No. 604), (7) "the burden of proving each allegation [that another person,

---

[7] The trial court instructed the jury of the elements of conspiracy (CALCRIM Nos. 415, 417), murder (CALCRIM Nos. 520, 521), conspiracy to commit murder (CALCRIM No. 563), attempted murder (CALCRIM No. 600), child abuse (CALCRIM Nos. 821, 823), assault with a deadly weapon (CALCRIM No. 875), simple assault (CALCRIM No. 915), felony false imprisonment (CALCRIM No. 1240), criminal threat (CALCRIM No. 1300), and burglary (CALCRIM No. 1700).

other than an accomplice was present during the burglary] beyond a reasonable doubt" (CALCRIM No. 3250), and (8) "the burden of proving beyond a reasonable doubt that the burglary was first degree rather than a lesser crime" (CALCRIM No. 1701). As to Mariano, the trial court also instructed the jury that the People must prove the allegations of personal use of a weapon and personal infliction of great bodily injury (CALCRIM Nos. 3185, 3160) beyond a reasonable doubt.

Additionally, the trial court instructed the jury regarding evidence of uncharged acts of domestic violence (CALCRIM No. 852A) and explained that the People must prove that the uncharged domestic violence took place by a preponderance of the evidence, "a different burden of proof from proof beyond a reasonable doubt," but that "[t]he People must still prove each charge and allegation beyond a reasonable doubt."

After closing arguments on May 19, 2021, the court instructed the jury pursuant to CALCRIM No. 3517, which explained how to fill out the verdict forms in light of lesser included offenses for the crimes of attempted murder, assault with a deadly weapon, and child abuse. That instruction advised the jury to fill out the verdict form for the greater offense if convinced that the prosecution had proven defendant guilty and, if not, that it could find defendant guilty of a lesser offense if "convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime." The court further reminded the jury, "As always, whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise."

### 4. *Closing arguments.*

The prosecutor argued to the jury regarding each element of conspiracy to commit murder and that each element had been proven beyond a reasonable doubt. The prosecutor further argued that he had proven the elements of attempted murder, proven defendant did not act in self-defense, and consequently had proven defendant committed attempted murder beyond a reasonable doubt. The prosecutor similarly referred to the

15.

burden of proof in arguing that he had proven Mariano's enhancements beyond a reasonable doubt. He discussed the evidence and charges by repeatedly arguing that he had proven each of the elements for each of the charges beyond a reasonable doubt for each count.

Mariano's defense counsel reminded the jury approximately three times that it had to believe beyond a reasonable doubt what transpired that evening, and that the prosecutor would have a chance to argue again because the prosecutor had the burden to prove beyond all reasonable doubt what happened that evening. Defendant's counsel argued that the jury had to determine whether the evidence proved defendant's guilt beyond a reasonable doubt and that the jury should hold the prosecutor to his burden of proving defendant's guilt beyond a reasonable doubt. Counsel specifically argued that the circumstantial evidence was insufficient to prove that defendant specifically intended to kill Wendy beyond a reasonable doubt. Counsel also explained the definition of reasonable doubt, differentiating between the other standards of proof used in court, and concluded, "It is an abiding conviction. In other words, there is no doubt in your mind what took place on October 20, 2019 is that [defendant], in fact, engaged in all or some of those counts that the Government is alleging." The prosecutor argued in rebuttal, "It's proof beyond a reasonable doubt. It's not proof beyond all possible or imaginary doubt. It's proof beyond a reasonable doubt."

During deliberations, the jury sent a note to the trial court that requested a portion of the prosecutor's closing argument discussing "1300," a reference to CALCRIM No. 1300, and also asked, "Do we have to find that all of the points 1–6 are true? Page 66." The elements of criminal threat, CALCRIM No. 1300, are on page 67 of the written jury instructions and lists six elements. The trial court responded, "In order to find guilt as to count 6, criminal threat, all six (6) requirements must be proven beyond a reasonable doubt." (Some capitalization omitted.)

**B. Applicable Law and Standard of Review**

Defendant argues that the trial court's failure to instruct the jurors on reasonable doubt (CALCRIM No. 220) just before deliberations violated his federal and state rights to due process and a fair trial. "State law and the federal Constitution require the trial court to instruct [that the prosecution must prove all elements of an offense beyond a reasonable doubt] when it advises the jurors of the applicable rules of law that govern their deliberation and decision. In California, a trial court ordinarily satisfies this obligation by instructing the jury under one of two 'pattern' or 'standard' reasonable doubt instructions. (See CALCRIM No. 220, CALJIC No. 2.90 .…)" (*People v. Aranda* (2012) 55 Cal.4th 342, 349 (*Aranda*).) However, a trial court's failure to give the standard reasonable doubt instruction does not necessarily constitute error if its substance is covered in other instructions given by the court. (*Id.* at pp. 354, 358.)

While a trial court's failure to explain to jurors in predeliberation instructions that the defendant could not be convicted unless the prosecution proved the elements of that crime beyond a reasonable doubt constitutes error under both state law and the federal Constitution, the instructional error under federal law is amenable to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. (*Aranda*, *supra*, 55 Cal.4th at p. 350.) "[A] reviewing court applying the *Chapman* standard to determine the prejudicial effect of the erroneous omission of the standard reasonable doubt instruction should evaluate the record as a whole—but not rely upon its view of the overwhelming weight of the evidence supporting the verdict—to assess how the trial court's failure to satisfy its constitutional obligation to instruct on the prosecution's burden of proof beyond a reasonable doubt affected the jury's determination of guilt. If it can be said beyond a reasonable doubt that the jury must have found the defendant's guilt beyond a reasonable doubt, the error is harmless. If the reviewing court cannot draw this conclusion, reversal is required." (*Id.* at p. 368.)

17.

The failure to define the term "reasonable doubt," however, does not amount to federal constitutional error, although the omission of a definition of reasonable doubt does constitute an error under state law. (See *Aranda*, *supra*, 55 Cal.4th at p. 374, fn. 14 [recognizing that both CALCRIM No. 220 and CALJIC No. 2.90 define beyond a reasonable doubt in terms of an abiding conviction that the charge is true].) Such a state law error is subject to harmless error review under the standard in *People v. Watson* (1956) 46 Cal.2d 818, 837, which asks whether there are "reasonable probabilities" that a result more favorable to the defendant would have occurred absent the error. (*Ibid*.)

## C. Analysis

### 1. *Other instructions adequately described the prosecution's burden to prove the offenses beyond a reasonable doubt.*

Defendant argues that the trial court's failure to instruct the jurors on reasonable doubt with CALCRIM No. 220 just before deliberations violated his federal and state rights to due process and a fair trial. However, we conclude that this case is controlled by our Supreme Court's decision in *Aranda*, *supra*, 55 Cal.4th 342 (reviewing the comparable CALJIC instructions), and the omission of CALCRIM No. 220 from the predeliberation instructions did not constitute federal constitutional error as to defendant's convictions.

In *Aranda*, the trial court failed to include a standard reasonable doubt instruction in its predeliberation instructions to the jury, but other instructions (relating to the murder charge) referred to the prosecution's burden of proving the defendant's guilt beyond a reasonable doubt and, therefore, our Supreme Court concluded that at least as to the voluntary manslaughter conviction, "the omission of the standard reasonable doubt instruction did not violate federal due process principles as to [the] defendant's conviction of voluntary manslaughter." (*Aranda*, *supra*, 55 Cal.4th at p. 358.) As in the

18.

instant case,[8] the instructions given by the *Aranda* trial court referred to the prosecution's burden of proving the defendant's guilt beyond a reasonable doubt, such as the instructions concerning the evaluation of circumstantial evidence, the murder charge, the murder charge's lesser included offenses, self-defense, justification, and the sentence enhancement allegations associated with that count. (*Id.* at pp. 351, 359–360.)

In this case, in addition to the instructions given in *Aranda*, the trial court also used the comparable CALCRIM instructions and discussed the reasonable doubt standard when explaining the distinction between murder and manslaughter, determining the degree of murder and choosing between murder and the lesser included offense of manslaughter also referred to the requisite standard of proof. Our Supreme Court noted that the various references to the standard of proof in the CALJIC version of the instructions " 'related to the murder charge itself and directly informed the jury that, to convict [the defendant] of murder, it had to find each and every element of that charge beyond a reasonable doubt.' " (*Aranda*, *supra*, 55 Cal.4th at p. 360, quoting with approval *People v. Mayo* (2006) 140 Cal.App.4th 535, 547.) As in *Aranda*, "[w]e conclude that in light of these other instructions[,] the omission of the standard instruction on the prosecutor's burden of proving guilt beyond a reasonable doubt did not amount to federal constitutional error with regard to defendant's conviction of [attempted murder]." (*Aranda*, at p. 361.)

However, the *Aranda* court did find a federal constitutional violation relating to the omission of the standard reasonable doubt instruction as affecting the gang offense because "neither the instruction on the elements of that offense nor any other instruction given by the court connected the reasonable doubt standard of proof to that charge." (*Aranda*, *supra*, 55 Cal.4th at p. 361.) Defendant argues that, in light of *Aranda* (whose

---

[8]     The trial court in this case used the CALCRIM versions of the instructions, which similarly referenced the burden of proof being beyond a reasonable doubt.

correctness defendant questions), his argument encompasses all counts other than attempted murder (count 1). However, the trial court's instructions on conspiracy included an instruction that the jurors must agree that "it is proven beyond a reasonable doubt that a defendant conspired to commit first degree murder" (CALCRIM No. 521). Additionally, the trial court explained to the jury that the People had (1) "the burden of proving beyond a reasonable doubt that [defendant] did not withdraw from the conspiracy" (CALCRIM No. 420), (2) "the burden of proving beyond a reasonable doubt that the killing—and you understand the conspiracy to kill—was first degree murder rather than a lesser crime" (CALCRIM No. 521), and (3) "the burden of proving [the first degree murder allegation] beyond a reasonable doubt" (CALCRIM No. 601). As to the burglary charge, the trial court advised the jury that the prosecution had "the burden of proving beyond a reasonable doubt that the burglary was first degree rather than a lesser crime" (CALCRIM No. 1701). Therefore, we conclude that there was no error as to the conspiracy to commit murder and burglary convictions.

As in *Aranda*, the trial court in the this case read the CALCRIM versions of instructions pertaining to the elements of child abuse (CALCRIM Nos. 821, 823), assault with a deadly weapon (CALCRIM No. 875), simple assault (CALCRIM No. 915), felony false imprisonment (CALCRIM No. 1240), and burglary (CALCRIM No. 1700), which advised the jury that the prosecution had the burden of proving each element but did not explain that they must be proved beyond a reasonable doubt. (See *Aranda*, *supra*, 55 Cal.4th at p. 361.) Our Supreme Court recognized that the gang enhancement allegation set forth the burden of proof, but it did not mention the burden of proof for the substantive gang offense and that the circumstantial evidence instruction's reference to the burden of proof was inadequate where the case depended largely on direct evidence. (*Ibid*.)

However, unlike *Aranda*, the trial court here instructed the jury as to their deliberations and the verdict form (CALCRIM No. 3517) that for attempted murder,

assault with a deadly weapon, and child abuse, the jury must follow directions which included completing the verdict form for the greater offense if each juror agreed that the prosecutor had proven defendant guilty of the greater offense and further explained that "whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise." Therefore, "[w]e conclude that in light of these other instructions the omission of the standard instruction on the prosecutor's burden of proving guilt beyond a reasonable doubt did not amount to federal constitutional error with regard to defendant's conviction[s] of [assault with a deadly weapon and child abuse charges]." (*Aranda*, *supra*, 55 Cal.4th at p. 361.)

As to the false imprisonment charge, we find two instructions significant to our conclusion that there was no error. In explaining eyewitness testimony (CALCRIM No. 315), the trial court instructed the jury that "[t]he People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." In explaining to the jury a defendant's right not to testify (CALCRIM No. 355), the trial court instructed that a defendant can "rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt."

Therefore, we conclude that the trial court's omission of the standard reasonable doubt instruction did not deprive defendant of his federal or state constitutional right to due process because the trial court's instructions otherwise covered the requirement that the prosecution prove defendant guilty of these offenses beyond a reasonable doubt.

> **2.**    **Even if the trial court erred in its instructions to the jury as to the burden of proof, the error was harmless beyond a reasonable doubt.**

Even if the trial court erred, we find any such error harmless under the *Chapman* standard used to determine the prejudicial effect of the erroneous omission of the standard reasonable doubt instruction and, after evaluating the record as a whole (except

21.

we have not looked at whether the overwhelming weight of the evidence supports the verdict), we can conclude beyond a reasonable doubt that the jury must have found defendant's guilt beyond a reasonable doubt. (See *Aranda*, *supra*, 55 Cal.4th at p. 368, applying *People v. Chapman*, *supra*, 386 U.S. at p. 24.)

As in *Aranda*, we conclude that there is no reasonable possibility that the jury failed to apply the reasonable doubt standard as to any of the charges when it found defendant guilty. (See *Aranda*, *supra*, 55 Cal.4th at p. 368.) First, the instructions relating to the attempted murder and conspiracy to commit murder counts included the prosecutor's burden to prove the offenses beyond a reasonable doubt. Additionally, the first degree burglary, witness, and corpus delicti instructions (among others) all imposed this burden of proof on the prosecution. In *Aranda*, our Supreme Court concluded that the instructions, as well as the sentencing enhancement instructions which included that burden of proof, amply conveyed the appropriate standard for those offenses and found it unrealistic that the jurors would have believed that a lesser burden of proof applied to the remaining offenses. (*Id.* at p. 369.) Unlike *Aranda*, the trial court here did instruct the jury on a different burden of proof regarding evidence of prior domestic violence and using coconspirator statements (CALCRIM No. 418), but its instructions were clear to differentiate when that standard applied, and the domestic violence instruction (CALCRIM No. 852A) cautioned that "[t]he People must still prove each charge and allegation beyond a reasonable doubt." Additionally, other instructions reinforced that the burden of proof as to all charges was beyond a reasonable doubt, such as explaining that a defendant does not have to testify and can argue that the prosecutor failed to prove the charges beyond a reasonable doubt (CALCRIM No. 355), defendant's statement alone cannot be used to prove guilt and the prosecutor must still prove defendant's guilt beyond a reasonable doubt (CALCRIM No. 359), and a defendant's failure to explain adverse evidence when testifying is not enough to prove guilt and the prosecutor must still prove the defendant guilty beyond a reasonable doubt (CALCRIM No. 361).

We find " 'the most logical response by the jury to the absence of instruction specifically linking the reasonable doubt standard to the [other] count[s] would have been to conclude that a guilty verdict on [those] charge[s] was subject to the same reasonable doubt standard that had been described in the court's instructions on murder, the lesser offenses, and the sentencing allegations."[9] (*Aranda*, *supra*, 55 Cal.4th at p. 370.)

Additionally, defendant and Mariano's attorneys emphasized the burden of proof, and the prosecutor used the term "beyond a reasonable doubt" in arguing that he had proven each offense and each element of the offenses. "[N]othing in counsel's arguments would have misled the jury to believe it should adjudge defendant's guilt of the [other] count[s] under a standard of proof less than beyond a reasonable doubt." (*Aranda*, *supra*, 55 Cal.4th at p. 370.)

Our Supreme Court in *Aranda* also considered the trial court's instructions to the jury during the selection process as support for the conclusion that there is no reasonable possibility that the jury's verdict was not based on a finding of guilt beyond a reasonable doubt. (*Aranda*, *supra*, 55 Cal.4th at p. 376 [trial court's instructions and remarks during jury selection cannot relieve the court of its obligation to properly instruct the jury during trial regarding the prosecution's burden of proving defendant's guilt beyond a reasonable doubt, but statements made by the court during jury selection may be considered in determining whether the court's error should properly be found harmless].) In its introductory comments, *Aranda*'s trial court read to the prospective jurors the standard reasonable doubt instruction (CALJIC No. 2.90) and continued to reference the standard throughout jury selection. (*Aranda*, at p. 371.)

---

[9]     *Aranda* distinguished *People v. Vann* (1974) 12 Cal.3d 220, 227 (a case cited by defendant) because in that case, the trial court's instructions did not include references to the burden of proof in reference to any substantive offense (unlike the murder instructions) and referred to it only regarding evidence and procedural issues. (*Aranda*, *supra*, 55 Cal.4th at p. 370.)

Here the trial court also read the standard reasonable doubt instruction (CALCRIM No. 103) to the first prospective jury panel and then to the second panel in the presence of the remaining prospective jurors from the first panel. As to the first panel, the trial court commented, "I'm actually going to read to all of you one jury instruction. You'll hear many of these later on in the trial, but this instruction is the instruction on the burden of proof. And it's important that I read that to you now." The trial court also assured the jury that each juror would have their own set of instructions containing the reasonable doubt instruction, thus indicating that the standard would apply throughout the trial. In addressing the second panel and remaining prospective jurors from the first panel, the trial court explained that as jurors, they would listen to the evidence and decide if the charges were proven beyond a reasonable doubt. The trial court told the jury that it would give them the law, each juror would have a set of jury instructions during deliberations, and the jurors would compare the evidence to the law and determine if "the charges [were] proven beyond a reasonable doubt." Although the trial court did not question each juror as to their understanding of reasonable doubt, counsel for defendants did question the jurors on the burden of proof, and the trial court did repeat the definition of reasonable doubt at the request of counsel.

The *Aranda* court also noted that none of the predeliberation instructions conflicted with, or prevented the jury from relying on, the trial court's repeated and detailed explanation during jury selection that the prosecution must prove every element of each offense beyond a reasonable doubt. (*Aranda*, *supra*, 55 Cal.4th at p. 373 [distinguishing *People v. Vann*, *supra*, 12 Cal.3d 220 because trial court's final instructions to jury informed jury that final instructions represented the entirety of the instructions that jury could use to decide the case].) In addition to the trial court's reading of the standard reasonable doubt instruction during selection, the trial court swore in the alternate jurors in the presence of the jury and advised the alternates that all instructions applied to them as well, thereby affirming for both the jurors and the

24.

alternate jurors that the court's instructions during jury selection applied throughout the trial.

During its initial instructions to the jury after being impaneled, the trial court advised the jury that it had already explained the burden of proof, thereby notifying the jury that the court's prior instructions continued to have force. During the trial, when explaining the burden of proof for a prior domestic violence incident, the trial court distinguished the preponderance of evidence standard and stated, "That does not change the burden of proof that the district attorney must prove each charge beyond a reasonable doubt." The trial court also prefaced its final instructions with, "I will now instruct you on the rest of the law that may apply to this case," thereby affirming its prior instructions on the burden of proof. In accordance with *Aranda*, the trial court here did not indicate that its prior instructions on reasonable doubt did not apply and even included the standard reasonable doubt instruction in the written instructions. (See *Aranda*, *supra*, 55 Cal.4th at p. 373 [nothing in trial court's final instructions would have led the jurors to believe they must ignore the court's explications of the prosecution's burden of proof given during jury selection].)

"Given the entire record in this case, and in particular the predeliberation instructions that expressly and directly connected the reasonable doubt standard to the charged murder and its lesser included offenses, including the [attempted murder and conspiracy] offense[s] of which defendant was convicted, we conclude that it is not reasonably possible that the jury would have believed that a guilty verdict on those other crimes must be based on a finding of guilt beyond a reasonable doubt but that some lesser standard of proof, or no standard at all, applied to the [other] count[s]. We can say beyond a reasonable doubt on the record before us that the jury's verdict on the [other] charge[s] must have been based on a finding of guilt beyond a reasonable doubt." (*Aranda*, *supra*, 55 Cal.4th at p. 373.) Therefore, any error from the trial court's failure

25.

to read the standard reasonable doubt instruction in its predeliberation instructions was harmless beyond a reasonable doubt.

### 3. Even if the trial court defining reasonable doubt during jury selection was not adequate to satisfy its obligation to define reasonable doubt, the error was harmless.

While the trial court's predeliberation instructions on the attempted murder and conspiracy to commit murder counts may have included the presumption of innocence and the prosecutor's burden of proving the crime beyond a reasonable doubt, as in *Aranda*, the instructions did not include a definition of reasonable doubt. (See *Aranda, supra*, 55 Cal.4th at p. 374.) The court's omission of a definition of reasonable doubt is not a violation of federal law but it does constitute an error under state law. (*Ibid*.) Nonetheless, having reviewed the record in accordance with the standard in *People v. Watson, supra*, 46 Cal.2d 818 for state law error, we conclude that there is no reasonable probability that the outcome would have been more favorable for defendant had the court provided in its predeliberation instructions a definition of the reasonable doubt standard of proof. (See *Aranda*, at p. 375.)

Nothing in the record suggests that the jury might have been confused regarding the meaning of reasonable doubt. (See *Aranda, supra*, 55 Cal.4th at p. 375.) In *Aranda*, the Supreme Court noted that the jury sent several notes requesting testimony and asking questions, but "the jury did not request clarification of the reasonable doubt principle 'as it surely would have done had it been confused as to the meaning of [that term].' " (*Ibid*.) Additionally, nothing in counsels' arguments invited the jury to apply a standard of proof less than beyond a reasonable doubt, or no standard at all. (See *ibid*.) In fact, the prosecutor addressed each element of each offense separately and after describing the evidence applicable to each element, concluded with a statement that the element had been proven "beyond a reasonable doubt," followed by a statement that the offense had been proven beyond a reasonable doubt. Defense counsel also discussed the definition of

reasonable doubt using the language from CALCRIM No. 103, and the prosecutor then addressed his burden of proving the evidence beyond a reasonable doubt in his rebuttal argument.

In *Aranda*, our Supreme Court found that the jury's acquittal of the defendant for a greater offense and conviction on a lesser offense "further suggest[ed] that the jury understood the prosecution's heavy burden of proving guilt beyond a reasonable doubt" and the prosecution "failed to carry its burden of proof as to the greater offense." (*Aranda*, *supra*, 55 Cal.4th at p. 376.) In this case, the jury had a question as to the elements of criminal threat, received clarification that all six elements must be proven beyond a reasonable doubt, but could not a reach verdict on that charge, which suggests that at least one juror did not believe that the prosecutor had met his heavy burden.

Finally, "[w]e can infer moreover that the jury was not left to guess as to the meaning of reasonable doubt because, as already noted, the record shows the court gave the definition when it read [CALCRIM No. 103] to the entire panel of prospective jurors," and counsel repeatedly discussed the standard during jury selection. (*Aranda*, *supra*, 55 Cal.4th at p. 376.) "Although not sufficient in itself to relieve the trial court of its obligation to define reasonable doubt for the sworn jurors during trial …, the court's remarks to prospective jurors can inform the harmless error analysis and further add some support to our conclusion that there is no reasonable probability that defendant would have obtained a more favorable outcome had the court included the standard reasonable doubt instruction or otherwise defined reasonable doubt during its predeliberation instructions to the jury." (*Ibid.*) Moreover, in this case, the trial court reminded the jury of the reasonable doubt instruction before opening statements and also provided written instructions to each juror during deliberations that included CALCRIM No. 103 and its definition of reasonable doubt.

Therefore, we conclude that there is no reasonable probability that the outcome of this trial would have been more favorable to defendant had the trial court defined the reasonable doubt standard of proof in its predeliberation instructions.

## DISPOSITION

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

LEVY, J.

FRANSON, J.

28.